Slip Op. 10-110

## UNITED STATES COURT OF INTERNATIONAL TRADE

CHINA FIRST PENCIL CO., LTD.,
SHANGHAI THREE STAR STATIONERY
INDUSTRY CO., LTD., and ORIENT
INTERNATIONAL HOLDING SHANGHAI
FOREIGN TRADE CORPORATION,

Plaintiffs,

-and-

SHANGDONG RONGXIN IMPORT &
EXPORT CO., LTD.

Consolidated Plaintiff

v.

UNITED STATES

Defendant

-and-

SANFORD, L.P. and MUSGRAVE PENCIL
CO., INC.,

Defendant-Intervenors.

**Before: Gregory W. Carman, Judge**

Consol. Court No. 09-00325

[*Plaintiffs' and Consolidated Plaintiff's motions for Judgment on the Agency Record are granted in part and denied in part. The Department of Commerce's Amended Final Results of Antidumping Duty Administrative Review are sustained in part and remanded in part.*]

Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP (Francis J. Sailer, Andrew Thomas Schutz, Mark E. Pardo, and Nikolas Edward Takacs), for Plaintiffs.

deKieffer & Horgan (John J. Kenkel, Gregory S. Menegaz, and J. Kevin Horgan), for Consolidated Plaintiff.

Neville Peterson LLP (George W. Thompson, and Casey Kernan Richter), for Defendant-Intervenors.

Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Carrie A. Dunsmore); and Daniel J. Calhoun, of counsel, Office of the Chief Counsel for Import Administration, Department of Commerce, for Defendant.

September 30, 2010

**OPINION & ORDER**

**CARMAN, JUDGE:** Plaintiffs China First Pencil Company, Ltd., Shanghai Three Star

Stationery Industry Company, Ltd., and Orient International Holding Shanghai Foreign

Trade Corporation, (collectively, the "China First Plaintiffs"), and Consolidated Plaintiff

Shangdong Rongxin Import & Export Company, Ltd., ("Rongxin") challenge the final

determination of the United States Department of Commerce ("Commerce" or "the

agency") in the 2006-2007 administrative review of the antidumping duty order on

Certain Cased Pencils from the People's Republic of China.  See Certain Cased Pencils

from the People's Republic of China: Final Results and Partial Rescission of

Antidumping Duty Administrative Review, 74 Fed. Reg. 33,406 (July 13, 2009) ("Final

Results"); Certain Cased Pencils from the People's Republic of China: Amended Final

Results of Antidumping Duty Administrative Review, 74 Fed. Reg. 45,177 (Sep. 1, 2009)

("<u>Amended Final Results</u>").  This administrative review covers entries of subject

merchandise made from December 1, 2006, through November 30, 2007.  <u>Final Results</u>,

74 Fed. Reg. at 33,406.  For the reasons set forth below, the Court grants in part and

denies in part both the China First Plaintiffs' and Rongxin's USCIT R. 56.2 motions for

judgment on the agency record.

**B<small>ACKGROUND</small>**

The Department of Commerce first imposed an antidumping duty order on

certain cased pencils from the People's Republic of China on December 28, 1994.

<u>Antidumping Duty Order: Certain Cased Pencils from the People's Republic of China</u>,

59 Fed. Reg. 66,909 (Dec. 28, 1994).  Commerce released the preliminary results of the

2006-2007 administrative review on January 7, 2009.  <u>Certain Cased Pencils from the</u>

<u>People's Republic of China; Preliminary Results and Partial Rescission of Antidumping</u>

<u>Duty Administrative Review</u>, 74 Fed. Reg. 673 (Jan. 7, 2009) ("<u>Preliminary Results</u>").

Commerce's unpublished Issues & Decision memorandum (P.R. # 154, <u>Issues and</u>

<u>Decision Mem. for the 2006-2007 Admin. Rev. of Certain Cased Pencils from the</u>

<u>People's Republic of China</u> ("<u>I&D Memo</u>")), issued on July 6, 2009, and incorporated in

the <u>Final Results</u> as an appendix, sets out the agency's analysis of the issues raised by

the parties at the administrative level.  <u>See</u> <u>I&D Memo</u>; <u>see also</u> <u>Final Results</u>, 74 Fed.

Reg. at 33,409.

The China First Plaintiffs and Rongxin filed separate challenges to the 2006-2007

Administrative Review.  After hearing the perspectives of the parties, the Court initially

determined not to consolidate the case.  (Letter Filed by Judge Carman, ECF No. 33.)

However, after each case was fully briefed, it was clear that not only were similar issues

challenged in each case, but the vast majority of the parties' argumentation centered on

the overlapping issues.  Accordingly, the Court decided that consolidation was

appropriate, and consolidated the cases by order entered on September 22, 2010.

(Order, ECF No. 59.)

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a)(2)

and 28 U.S.C. § 1581(c).[1]

## STANDARD OF REVIEW

When reviewing the final results of antidumping administrative reviews, "[t]he

court shall hold unlawful any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with

law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence is more than a mere scintilla."

Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).  "Substantial evidence is 'such

relevant evidence as a reasonable mind might accept as adequate to support a

---

[1] All citations to the United States Code refer to the 2006 edition.

conclusion.'"  Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369, 1374

(Fed. Cir. 2003) (quoting Consol. Edison Co., 305 U.S. at 229).  In determining the

existence of substantial evidence, a reviewing Court must consider "the record as a

whole, including evidence that supports as well as evidence that 'fairly detracts from

the substantiality of the evidence.'"  Huaiyin, 322 F.3d at 1374 (quoting Atl. Sugar, Ltd.

v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  "[T]he possibility of drawing two

inconsistent conclusions from the evidence does not prevent an administrative agency's

finding from being supported by substantial evidence."  Consolo v. Fed. Maritime

Comm'n., 383 U.S. 607, 620 (1966) (citations omitted).  There must be a "rational

connection between the facts found and the choice made" in an agency determination if

it is to be characterized as supported by substantial evidence and otherwise in

accordance with law.  See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168

(1962).

### DISCUSSION

The imposition of an antidumping duty on subject merchandise imported into

the United States depends upon "a fair comparison" being made between the export

price, or constructed export price, and the normal value of the subject merchandise.  19

U.S.C. § 1677b(a).  If the subject merchandise is produced in a nonmarket economy, and

if Commerce "finds that available information does not permit the normal value of the

subject merchandise to be determined under [19 U.S.C. § 1677b(a)]," the statutory

scheme provides Commerce with an alternative method for computing normal value.

19 U.S.C. § 1677b(c)(1).  This method requires Commerce to determine normal value

"on the basis of the value of the factors of production utilized in producing the

merchandise . . . in a market economy country or countries."  19 U.S.C. § 1677b(c)(1).

The Court of Appeals for the Federal Circuit ("CAFC") has described this procedure as

aiming "to assess the price or costs of factors of production of [the subject merchandise

in a surrogate market economy country,] in an attempt to construct a hypothetical

market value of that product in [the nonmarket economy country]."  Nation Ford

Chem. Co. v. United States, 166 F.3d 1373, 1375 (Fed. Cir. 1999).

    All of the issues contested by the parties in this case relate to the values selected

by the agency for certain factors of production used in constructing normal value.

According to the statutory scheme, factors of production "include, but are not limited

to—(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts

of energy and other utilities consumed, and (D) representative capital cost, including

depreciation."  19 U.S.C. § 1677b(c)(3).  First, both the China First Plaintiffs and Rongxin

challenge the figure used by Commerce to value labor, which was produced by a

regression analysis that predicted a country's wage rate according to its level of

economic development (i.e., its national income).  Second, the China First Plaintiffs and

Rongxin challenge various values assigned to raw materials.  Both the China First

Plaintiffs and Rongxin challenge Commerce's surrogate value for pencil slats and cores.

Separately, the China First Plaintiffs challenge the surrogate value for lacquer, and

Rongxin challenges Commerce's surrogate values for castor oil and kaolin clay.  Last,

Rongxin challenges the surrogate value for coal (used as an energy source), and for

packaging.

## I.    <u>Commerce's Use of a Regression Based Wage Rate to Value Labor</u>

Defendant concedes that a remand on the issue of the wage rate is appropriate.

Less than two weeks after Rongxin completed briefing its USCIT R. 56.2 motion, and

shortly before the government filed a response to the China First Plaintiffs' USCIT R.

56.2 motion, the CAFC ruled in <u>Dorbest Ltd. v. United States</u>, 604 F.3d 1363 (Fed. Cir.

2010) ("<u>Dorbest</u>"), that Commerce's method for valuing labor based on its regression

analysis was contrary to law.  In <u>Dorbest</u>, the CAFC held that Commerce's regulation

establishing the regression analysis for valuing labor as a factor of production, 19 C.F.R.

§ 351.408(c)(3), did not satisfy statutory requirements.  <u>Dorbest</u>, 604 F.3d at 1372.

Specifically, the figures produced by the regression failed to "utilize, to the extent

possible, the prices or costs of factors of production in one or more market economy

countries that are—(A) at a level of economic development comparable to that of the

nonmarket economy country, and (B) significant producers of comparable

merchandise." 19 U.S.C. § 1677b(c)(4).  Instead, Commerce's analysis produced an

expected wage by regressing data from countries at all levels of economic development,

without regard for whether any of these countries were significant producers of

comparable merchandise.  Because Commerce's regulation establishing the regression

based method for calculating a wage rate has been invalidated by the CAFC, and in

light of the parties' collective acknowledgment that the wage rate relied on in the <u>Final

Results</u> is therefore contrary to law, this issue is remanded to Commerce for action

consistent with the holding in <u>Dorbest</u>.  (<u>See</u> Def.'s Opp'n. to Pl.'s Mot. for J. Upon the

Agency R. ("Def.'s Resp. to China First") 23; <u>see also</u> Def.'s Resp. to Court's Letter

Regarding Dorbest Ltd. v. United States, Court No. 09-316, ECF No. 36.)

**II.     <u>Commerce's Selected Surrogate Values for Raw Materials</u>**

> **A.     Slats**

> > *1.     Parties' Arguments*

At the core of the dispute over slats is Commerce's decision to use data on

American lumber prices rather than data on Indian slat prices, when valuing slats as a

factor of production.  During this administrative review, Commerce valued lindenwood

pencil slats with data taken from the Hardwood Market Report, which consists of

"publicly available, published U.S. prices for American basswood lumber."  <u>I&D Memo</u>

at 39.  The China First Plaintiffs and Rongxin would have preferred that Commerce use

data from an "Indian stationery journal" called Paper and Stationery, that provided

information on the cost of pencil slats for Indian pencil producers.  (China First Mot. at

7-8.)  Both the China First Plaintiffs and Rongxin use pre-manufactured pencil slats,

rather than lumber, in producing the subject merchandise.  (China First Mot. at 6-7;

Rongxin Mot. at 23.)  Consequently, they argue that the decision to value slats using

lumber prices, when slat prices were also on the record, is facially indefensible, and is

unsupported by substantial evidence on the record.  (China First Mot. at 10-11; Rongxin

Mot. at 23.)

        Commerce heard and rejected this argument at the administrative level, tracing

what it called a "preference for wood type over a slat-specific price" back to the original

less-than-fair-value investigation.  <u>I&D Memo</u> at 39.  In other words, Commerce

believed it had taken a position during the original investigation that, when selecting a

surrogate value for slats made from a particular kind of wood, it was preferable to use

pricing data for a comparable type of wood, even if not slat-specific, than to use pricing

data for slats made from dissimilar wood.

        In their USCIT R. 56.2 Motion, the China First Plaintiffs pointedly dispute

Commerce's take on the original investigation, and Commerce now partially abandons

its position.  The China First Plaintiffs assert that "[t]his review constitutes the first

instance in which the record has contained pricing data specific to the exact input used

by respondents' [sic] in their pencil production," slats, and that consequently,

Commerce could never have established a preference during the investigation in the

way the agency claims.  (China First Mot. at 12.)  Defendant now concedes that

Commerce was incorrect about the establishment of a preference for wood type over a

slat specific price, acknowledging that there were no slat prices on the record during the

initial investigation in this case.  (Def.'s Resp. to China First at 13.)  Nevertheless,

Defendant and Defendent-Intervenors defend and maintain the position that wood type

is a paramount consideration in selecting a surrogate value for slats, and contend that

the similarity of Chinese lindenwood and American basswood is sufficient grounds for

the Court's affirmance. (Def.'s Resp. to China First at 10-15; Def-Intervs.' Opp'n. to Pls.'

Mot. for J. on the Agency R. ("Def-Intervs.' Resp. to China First") at 18-25.)

        The China First Plaintiffs and Rongxin sharpen their criticism of Commerce's

reliance on the Hardwood Market Report, by asserting that even if it contains data for a

similar species of wood, it does not necessarily include pricing data for the grade of

wood that would be used in pencil production.  Rongxin emphatically asserts that the

quality of wood it uses to manufacture pencil slats is of "the cheapest grade," and that

consequently, Commerce's decision to average "all grades" of American basswood in

producing a surrogate value was incorrect.  (Rongxin Mot. at 23.)  The China First

Plaintiffs point out that "there is absolutely no record evidence even suggesting that the

lumber referenced in the *Hardwood Market Report* is ever used in connection with pencil

production."  (<u>China First Mot.</u> at 11.)  To the contrary, they point out, a previous issue

of the Hardwood Market Report indicated that it "is primarily intended to reflect prices

of lumber for the construction industry."  (<u>Id.</u> (<u>citing</u> P.R. 72, at Exhibit SV-4.)  Rongxin

also asks for the Court to remand on the issue of slat prices for Commerce to correct a

clerical error that it admitted but was unable to correct after Rongxin had filed suit in

this court, since the suit divested the agency of jurisdiction over the case.[2]  (<u>Id.</u> at 24.)

 Defendant and Defendant-Intervenors also point to this lack of evidence in the

record pertaining to wood grade, believing its absence weighs in favor of affirmation.

Defendant points out that Commerce did not average all grades of American basswood

lumber, as Rongxin claims, but rather excluded certain higher grades in producing a

surrogate value.  (Def.'s Resp. to China First at 16; Def.'s Resp. to Rongxin at 18-19.)

Without information that would tend to establish the impropriety of using the

American basswood prices, and given that Commerce's use of American basswood

lumber prices has been affirmed by this court in the past, Defendant and Defendant-

Intervenors urge the Court to do so again.  (Def.'s Resp. to China First at 13, 15; Def.-

---

[2]Rongxin also bids the court to instruct Commerce "that it would no longer be appropriate to use the yield factor from raw lumber to slats, since that ratio would be inherently included in the slat prices[, and t]o include that ratio would be double counting."  (<u>Id.</u>)  Rongxin does not elaborate on this point, and offers no citation to the record in support of this assertion.

Intervs. Resp. to China First at 23 (both <u>citing</u> <u>Writing Instrument Mfrs. Ass'n. v. United</u>

<u>States Dep't. of Comm.</u>, 21 CIT 1155, 984 F. Supp. 629 (1997), <u>aff'd without opinion</u>, 178

F.3d 1311 (Fed. Cir. 1998)).)  Finally, Defendant further justifies its position by claiming

that the Hardwood Market Report data is of higher quality than the Paper & Stationery

data, and by claiming that the agency is entitled to deference from the Court. (Def.'s

Resp. to China First at 18-25.)

       2.     *Analysis*

      Under the statutory scheme, Commerce is required to value the factors of

production "based on the best available information," and the Court reviews

Commerce's choice of what constitutes the best available information under the

"substantial evidence" standard.  19 U.S.C. § 1677b(c) & 1516a(b).  The Court's role is

not to make that determination anew, but rather to decide "whether a reasonable mind

could conclude that Commerce chose the best available information." <u>QVD Food Co.,</u>

<u>Ltd. v. United States</u>, 34 CIT __, 2010 WL 3421963 at *2 (2010) (<u>quoting</u> <u>Goldlink Indus.</u>

<u>Co. v. United States</u>, 30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006)).  If there are

multiple sources of information in the record upon which Commerce could reasonably

value a factor of production, the Court will defer to the agency's exercise of discretion.

However, Commerce "may not act arbitrarily in reaching its decision," <u>Goldlink</u>, 431 F.

Supp. 2d at 1327, and if the Court finds that no reasonable mind could conclude that the

information relied upon was the best available, the agency's decision will be set aside.

The Court determines that a reasonable mind could not conclude that American basswood lumber prices from the Hardwood Market Report are the "best available information" in this record for valuing pencil slats as a raw material factor of production.  When considered in contrast with the pencil slat prices included in the Paper and Stationery article, it is clear that the Hardwood Market Report data, and Commerce's own reasoning, suffer from significant inadequacies that make sustaining the agency's selection impossible.  In essence, Commerce's surrogate value selection for pencil slats is based on arbitrarily selected data for an incongruous product from an economy incomparable to that of the nonmarket economy country.  Each of these maladies is explained in greater detail below.

Defendant's and Defendant-Intervenors' peculiar insistence that Commerce must use American lumber prices, rather than Indian slat prices, to approximate the value of pencil slats in India, has its roots in a mistake Commerce admits to making but attempts to minimize. During this review, Commerce believed that it had previously rejected slat prices in favor of lumber prices for an analogous type of wood.  The agency's judgment was thus clouded by the erroneous belief that the agency had previously determined that slat-specific prices were less important than prices for a correlating type of wood.  While Commerce attempts to defend its selection by insisting that comparable wood

type is highly important, it may not simply erase an acknowledged mistake in legal

reasoning from the challenged administrative determination without warranting a

remand.

Although Defendant argues that American basswood lumber prices have been

used to value pencil slats in previous phases of this case (and upheld by the court), the

use of an incongruous product is neither necessary nor appropriate in this

administrative review.  First, the input used by the respondents has changed since the

initial investigation.  Originally, they manufactured their own pencil slats in the

production of the subject merchandise; as such, lumber was their actual input.  (China

First Mot. at 6-7; Rongxin Mot. at 23.)  By this administrative review, however, both the

China First Plaintiffs and Rongxin use pre-manufactured pencil slats, and not raw

lumber, in producing the subject merchandise.  Second, this is the first administrative

review in which slat prices, in any form, were placed on the record.  Taken together, the

change in input used by the respondents and the first time appearance of a product

specific surrogate price in the record should have dramatically impacted the agency's

surrogate value determination.

The Hardwood Market Report data used by the agency suffer from further

inadequacies.  For one, the data establish the price of this incongruous product

(basswood lumber) in the United States of America—a market economy country that is

not at a level of economic development comparable to the nonmarket economy country,

China.  The use of data from a comparably economically developed country is a

statutory obligation, that the agency must adhere to "to the extent possible."  19 U.S.C.

§ 1677b(c)(4).  Moreover, upon hearing respondents' assertions that the grades of

basswood in the Hardwood Market Report are not appropriate for use in pencil

production, Commerce used pricing data for two grades, "grades 1 and 2 common,"

while excluding pricing data for "the higher-value Select and Better" grades.  (P.R. 97 at

7-8.)  This exclusion is arbitrary and unsupported by substantial evidence in the record.

Additionally, while all parties underscore the lack of record evidence correlating

the grades of wood in the Hardwood Market Report with the grade(s) of wood used in

manufacturing the subject merchandise, the Court views the absence of information as

primarily detrimental to the agency's position.  Even after Commerce's exclusion of the

"Select and Better" grades from the Hardwood Market Report data, the China First

Plaintiffs and Rongxin argue that the grades of wood in the Hardwood Market Report

(and the prices derived therefrom) are for a higher quality of lumber than is used for

pencil production.  Defendant and Defendant-Intervenors fault their opponents for

failing to place evidence on the record that definitively demonstrates the impropriety of

the wood grades in the Hardwood Market Report.  In the Court's view, the presence of

slat prices on the record for the first time is consequential, and tilts this issue in favor of

the respondents.  In previous stages of this case, Commerce may have been able to rely

on American basswood prices without needing to first establish that grades of wood

reflected in those prices correlated with the grade(s) of wood used to manufacture

pencils.  However, now that there are prices on the record that indisputably correlate

with the grade of wood used to manufacture pencils (because the prices are for actual

pencil slats), reliance on lumber prices that are not grade-correlated is problematic.

Regardless of how well this data fits the agency's other standards for selecting a

surrogate value, the fundamental flaws cited above mean that the Hardwood Market

Report data cannot reasonably be considered the best available information, when

considered in light of the alternative.  The standards employed by Commerce to

determine which data will be used to produce a surrogate value are all oriented around

ensuring that the data used is reliable.  Commerce explains that such data should be

publicly available, countrywide rather than single-source, representative of a range of

prices, adequately documented, and tax-exclusive.  Regardless of how well the

Hardwood Market Report data may fit such standards, they cannot cure the

shortcomings identified above.  For these reasons, then, Commerce's surrogate value for

pencil slats is unsupported by substantial evidence in the record, and is not in

accordance with law.  Accordingly, on remand, Commerce shall recalculate a surrogate

value for pencil slats using the Paper and Stationery data.

### B.     Cores

#### 1.     *Parties' Contentions*

Commerce composed a value for pencil cores by relying on Indian import

statistics contained in the World Trade Atlas ("WTA data").  Specifically, to value cores,

Commerce weight-averaged WTA data from the period of review for products

imported under the harmonized tariff subheading 9603.20.00 for "PENCIL LEADS,

BLACK/COLOURED."[3]  (P.R. # 93, at ex. 4.)  The resulting figure of 389.96 Rs./kg was

used as the surrogate value for four separate raw materials used to manufacture the

subject merchandise: black cores, color cores, thick black cores, and thick color cores.

(P.R. # 93 at 5.)  The China First Plaintiffs also placed on the record prices for

domestically (Indian) produced pencil cores, in the form of the Paper and Stationery

article, along with price lists from a company that is described in the Paper and

Stationery article as the "only . . . known supplier of Lead core [sic] in India, M/s Lead

Slips Products Pvt. Ltd, Ahmedabad."  (P.R. # 111, at ex. 2.)  Commerce declined to use

the domestic pricing information.

In determining to use the WTA data rather than the Paper and Stationery data,

Commerce again outlined the criteria it has established for selecting surrogate value

---

[3] The weighted average excluded imports from China, a nonmarket economy, and from South Korea, a country known to "provide non-industry-specific export subsidies."  (P.R. # 93 at 3.)

information.  First, the agency explained that "surrogate value information is normally

based on the use of publically available information."  (I&D Memo at 37.)  Second,

Commerce "looks for surrogate values that are 'representative of a range of prices in

effect during the POR and information that includes numerous transactions."  (Id.

(internal quotation omitted).)  Third, the agency seeks to avoid "using single-source

information and prefers country-wide information," to the extent possible.  (Id.)

Finally, Commerce does not use "price data that has inadequate supporting

documentation and prefers to use tax-exclusive sources instead of tax-inclusive

domestic prices."  (Id.)

    After reproducing the selection criteria, Commerce applied them to the data

available in this case, and determined that the WTA import data was preferable to the

domestic price lists and Paper and Stationery data for producing a surrogate value for

pencil cores.  (Id. at 42-43.)  First, Commerce pointed out that the Paper and Stationery

article did not contain evidence to establish whether the prices contained therein "are

from a price list or if they represent actual transactions."  (Id. at 42.)  Second, the agency

observed that the article did "not appear to be a regular industry survey of prices."  (Id.)

Next, Commerce cited a lack of information regarding the total volume of sales, and

whether the prices were tax-exclusive.  (Id.)  Finally, the agency pointed out that the

article "refers to a major price revision effected by this party in August of 2006,"

which, being prior to the start of the POR, left open the question of whether the prices

prevailed throughout the POR.  (Id. (quotation omitted).)

Rongxin notes and objects to Commerce's use of the WTA data to produce a

surrogate value specifically for color cores.  (Rongxin Mot. at 20-23.)  Using math that

the Court is unable to follow or reproduce, Rongxin asserts that the WTA values color

cores "almost 500% more than the average price of all sales of domestic color cores.[4]"

(Id. at 20 (emphasis in original).)  Rongxin also points out that in other cases, Commerce

has occasionally declined to use WTA import data when it found the data to be

inaccurate.  (Id.)  However, Rongxin does not identify any inaccuracies in the WTA

import data used in this case.  Rongxin asserts that the WTA import data is not the "best

available information" within the meaning of 19 U.S.C. § 1677b(c)(1), but develops no

other cognizable argument as to why the information is not the best available.

The China First Plaintiffs also draft objections to Commerce's use of WTA data to

---

[4]Rongxin cites the Paper and Stationery article which states that "coloured leads
varied anywhere from Rs. 25 per gross . . . to Rs. 30 per gross," and that the weight of a
typical gross is "approximately 190 gms."  (P.R. # 111, ex. 2.)  Rongxin claims that "[t]his
translates to a price of Rs. 59-71 per kg."  (Rongxin Mot. at 20.)  Assuming that a gross
(144) color cores weighs approximately 190 grams, one should multiply the price per
gross by a factor of about 5.26 (which is 1000 grams / 190 grams), to calculate a price per
kilogram.  This would mean that a price range of Rs. 25-30 per gross would translate to
a price range of about Rs. 132-158 per kilogram.  In turn, this would mean that the
surrogate value of Rs. 389.96 per kilogram is between 247% and 296% higher than the
figures reported for color cores in Paper and Stationery.  While this remains a
substantial price disparity, it is roughly half of the size of the price disparity alleged by
Rongxin.

design a surrogate value for all pencil cores.  The China First Plaintiffs cite a litany of

cases in which this court has set aside the agency's decision to produce a surrogate

value using import statistics, when some form of domestic prices were on the record as

well.  (China First Mot. at 23-28.)  A frequent concern noted by the court in these cases is

that the import data often yields a higher surrogate value than the rejected domestic

data would have—a notable feature of the import and domestic values for pencil cores

in the instant case.  As the China First Plaintiffs put it, "[t]hese cases reflect the very

obvious economic principle that it is unreasonable to presume that a producer acting

under market economy conditions would use more expensive imports for a

domestically available input unless there was an explanation for this choice."  (China

First Mot. at 24 (citing Yantai Oriental Juice Co. v. United States, 26 CIT 605, 617 (2002),

and Hebei Metals and Mineral Import and Export Corp. v. United States, 29 CIT 288,

300, 366 F. Supp. 2d 1264 (2005)).)  Additionally, the China First Plaintiffs point out that

the dates of the various price lists and the Paper and Stationery article itself, while not

falling within the POR, indicate that comparable prices prevailed before and after the

POR, making interpolation with the domestic data reasonable.  (China First Mot. at 28-

29.)

        One last issue contested by the parties is whether the HTS subheading from

which the surrogate values for pencil cores were taken is overly broad, which is to say,

whether it includes products other than the types of pencil cores (black, color, thick

black and thick color) used in producing the subject merchandise.  The China First

Plaintiffs assert that this is the case, but Defendant and Defendant-Intervenors maintain

that there is nothing in the record to establish over-inclusiveness in the manner

suggested.  (China First Mot. at 25-26 (asserting that the vast range of prices in the WTA

data for this input goes unexplained in the I&D Memo); Def.'s Resp. to China First at 18-

19; Def-Intervs.' Resp. to China First at 26-27.)

    2.    *Analysis*

In assigning the same surrogate value to the four types of pencil cores used in

producing the subject merchandise (black cores, color cores, thick black cores, and thick

color cores), Commerce failed to take into account record evidence which demonstrates

that these products have vastly different costs or prices.  This failure to "includ[e]

whatever fairly detracts from the substantiality of the evidence," means that the

agency's determination of a surrogate value for pencil cores is unsupported by

substantial evidence and is not in accordance with law.  See Atlantic Sugar, 744 F.2d at

1562.

The Paper and Stationery article and the price lists from Lead Slips Products Pvt.

Ltd. that were placed on the record by the China First Plaintiffs unanimously indicate a

wide range of prices that vary in accordance with the type (i.e., color and size) of the

pencil lead.  For instance, according to the price lists, "Degree or Drawing Leads" that

are 3.40 mm in diameter cost 147% more than the same type of lead with a 2.00 mm

diameter.  (P.R. # 72, at Exs. SV-3C, SV-3D.)  Similarly, the price lists reveal that "Non-

Toxic 12 Coloured Leads" range in price such that the widest diameter lead is roughly

twice as expensive as the narrowest diameter black lead.  (Id.)  This trend is similarly

reflected in the Paper and Stationery article, which indicates that colored leads of 2.70

mm to 3.30 mm in diameter cost slightly more than twice what 2.20 mm black leads

cost.  (P.R. # 111, Ex. 2.)  Reviewing all prices submitted by the China First Plaintiffs, the

cheapest "Commercial Quality - Black Leads," which the China First Plaintiffs claim to

utilize in producing the subject merchandise, are roughly 1/5 the cost of the most

expensive thick colored leads.  (Id., P.R. # 72, Exs. SV-3C, SV-3D; see also China First

Mot. at 21.)  These sources on the record uniformly indicate that colored leads are more

expensive than black leads, and that price increases with lead diameter.

  Commerce's obligation to take into account evidence that "fairly detracts" from

what the agency determines to be the substantiality of the evidence means that these

sources may not be wholly disregarded.  While Commerce provided several reasons for

its belief that the WTA import data was a more reliable pricing source than the Paper

and Stationery article and the price lists, the agency's decision to assign the same

surrogate price to black cores, color cores, thick black cores and thick color cores is not

only unsupported by the record evidence, but is directly controverted by it.  Regardless

of whether HTS subheading 9609.20.00 includes additional types of pencil lead that are

not used in producing the subject merchandise, as the China First Plaintiffs allege, it

simply fails to distinguish separate prices for these four separate raw materials.  It is a

near certainty, then, that the figure for each of the four types of pencil cores misstates

their actual cost: the cost of black cores inflated by the cost of color cores, and vice versa,

and the cost of thick cores deflated by the cost of thin cores, and vice versa.  On remand,

Commerce is instructed to identify separate surrogate values, supported by substantial

evidence in the record, for black cores, color cores, thick black cores, and thick color

cores.

> **C.     Lacquer**
>
>> *1.     Parties' Arguments*

The China First Plaintiffs also independently challenge Commerce's selection of a

surrogate value for lacquer, "for many of the same reasons discussed . . . with respect to

pencil cores."  (China First Mot. at 31.)  Commerce produced a surrogate value for

lacquer by weight-averaging the WTA import data for HTS subheading 3208.10,

"Polyestr," after excluding data from certain countries.  (P.R. # 93, Ex. 4.)  The figure

produced by this method, 200.30 Rs./kg, contrasts with a figure for domestically

available lacquer, listed in the Paper and Stationery article as 150-160 Rs./kg.  The China

First Plaintiffs express concern that the WTA import data may not be specific to pencil

lacquer, but cite no record evidence to support the view that this HTS subheading is

overly broad.  Additionally, the China First Plaintiffs complain that the lacquer prices in

the WTA import data vary widely, depending on country, from 30.20 Rs./kg to 725.31

Rs./kg.  In their view, taking an average from such disparate figures cannot produce "an

accurate approximation of a pencil lacquer value," and must therefore be unsupported

by substantial evidence in the record.  (China First Mot. at 31.)  Last, the China First

Plaintiffs assert that Commerce's comparison of the domestic and import values at the

administrative level was insufficient, ostensibly because Commerce failed to consider

any disadvantages of the import data, and failed to consider any merits of the domestic

data.

Commerce defends its determination in regard to lacquer prices by reiterating

the deficiencies it found with respect to the Paper and Stationery data.  That data came

"from a single producer," and contained no indication of whether the prices reflected

actual transactions, or whether the transactions were nationwide.  (Def.'s Resp. to China

First at 21; see also Def-Intervs.' Resp. to China First at 28-29.)  Defendant-Intervenors

emphasize that the China First Plaintiffs have provided no substantiated basis for

believing that the WTA import data is "inaccurate or inferior in any way."  (Def-

Intervs.' Resp. to China First at 29.)

2.      *Analysis*

The Court is not persuaded by the China First Plaintiffs' arguments with respect to the surrogate value for lacquer.  Unlike with slats and cores, where the China First Plaintiffs used record evidence to establish a basis for doubting the fundamental appropriateness of the data used by Commerce to create a surrogate value, concerns about the lacquer data appear to be purely speculative.  The China First Plaintiffs can point to nothing in the record that demonstrates the impropriety of the WTA import data.  The mere fact that the WTA import data spans a relatively wide range of prices does not delegitimize Commerce's use of it.  Similarly, simply because there are lower domestic lacquer prices on the record, Commerce does not lose its discretion to determine what it believes constitutes the "best available information" within the meaning of 19 U.S.C. § 1677b(c)(1).  Commerce's stated concerns about the lacquer values in the Paper and Stationery data track with the agency's previously articulated standards, and form a legitimate basis for using the WTA import data instead.  For the foregoing reasons, then, the Court holds that Commerce's determination with respect to the surrogate value for lacquer is supported by substantial evidence in the record, and is therefore sustained.

**D.      Castor Oil**

Rongxin devotes four sentences of its USCIT R. 56.2 Motion to challenging the

surrogate value selected by Commerce for castor oil, and the Court is not persuaded.

Without citing to the record, Rongxin claims that the imported price is higher than the

domestic price, and claims that the WTA import data "suffer[s]" from certain unnamed

"pitfalls." (Rongxin Mot. at 24-25.)  Defendant responds by pointing out that

Commerce selected a surrogate value for castor oil from nationwide import statistics,

rather than the domestic data, which was based on just two Indian markets.  (Def.'s

Resp. to Rongxin at 21.)  Hearing no compelling argument to the contrary, the Court

holds that Commerce's rationale for relying on WTA import data to select a surrogate

value for castor oil is supported by substantial evidence in the record, and is otherwise

in accordance with law, and is therefore sustained.

> **E.    Kaolin Clay**

The three sentences of Rongxin's motion devoted to disputing Commerce's

selection of a surrogate value for kaolin clay do not produce a winning argument.

While Rongxin would have preferred Commerce to use a lower domestic price for

kaolin clay, Commerce declined to do so because the domestic values Rongxin provided

were "not contemporaneous with the entirety of the period of review," and because

Rongxin "fails to explain how its values were derived."  (<u>Id.</u>, <u>see also</u> Rongxin Mot. at

25.)  Hearing no compelling argument to the contrary, the Court holds that Commerce's

rationale for relying on WTA import data to select a surrogate value for kaolin clay is

supported by substantial evidence in the record, is otherwise in accordance with law,

and is therefore sustained.

**III.   Commerce's Selected Surrogate Values for Energy & Packaging**

**A.   Coal**

In less than 75 words, Rongxin disputes Commerce's surrogate value for coal, by

claiming that the import prices are "not representative of domestic prices," and "could

contain errors."  (Rongxin Mot. at 24.)  The Court finds this argument tautological,

speculative, and unpersuasive, and therefore affirms Commerce's selection of a

surrogate value for coal.

**B.   Packaging**

Rongxin would have preferred that Commerce use domestic prices to obtain a

surrogate value for packaging because the import prices are higher than the domestic

prices.  (Rongxin Mot. at 25.)  Commerce rejected domestic packaging prices because

Rongxin did not provide product descriptions that would permit the agency to

adequately compare the Indian product with the product used by the Chinese

manufacturers.  (Def.'s Resp. to Rongxin at 21.)  Because Commerce's decision was

rational and is supported by substantial evidence on the record, and is otherwise in

accordance with law, the Court affirms Commerce's selection of a surrogate value for

packaging.

**CONCLUSION**

For the foregoing reasons, then, it is hereby

**ORDERED** that Commerce's determination is remanded to the agency for

further action consistent with this opinion, and it is further

**ORDERED** that Commerce shall adjust the surrogate value for labor to conform

with the statutory requirements, as explained in <u>Dorbest Ltd. v. United States</u>, 604 F.3d

1363 (Fed. Cir. 2010) , and it is further

**ORDERED** that Commerce shall recalculate a surrogate value for pencil slats

using the pricing data for pencil slats in the Paper & Stationery article rather than the

pricing data for American basswood lumber from the Hardwood Market Report, and it

is further

**ORDERED** that Commerce shall recalculate separate surrogate values for black

cores, color cores, thick black cores, and thick color cores that reflect the differences in

price established by the Paper & Stationery article and by the price lists in the record,

and it is further

**ORDERED** that Commerce shall file the results of its redetermination on remand

no later than **Thursday, October 21, 2010**, and it is further

**ORDERED** that any comments on the remand results shall be filed no later than

**Thursday, November 4, 2010**, and it is further

**ORDERED** that any replies to any comments on the remand results shall be filed

no later than **Monday, November 15, 2010**, and it is further

**ORDERED** that Commerce's determination is sustained in all other respects.


                                              ___/s/ Gregory W. Carman___
                                              Gregory W. Carman, Judge

Dated:        September 30, 2010
              New York, NY